# AFFIDAVIT IN SUPPORT OF APPLICATION FOR A SEARCH WARRANT

## (4848 Wolf Creek Pike, Dayton, OH 45417)

I, **Robert Kukovec**, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent with Homeland Security Investigations (HSI) within the United States Department of Homeland Security (DHS). I have been employed as a Special Agent since April 2002, and I am currently assigned to the HSI office in Columbus, Ohio. I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search or seizure warrant. I am currently assigned to a multi-jurisdictional narcotics task force in the central Ohio area, and I am cross designated to investigate violations of Title 21 of the United States Code. Prior to my employment with HSI (and formerly U.S. Customs), I was employed as a police officer in the state of Ohio for approximately 8.5 years. My responsibilities and duties include the investigation and enforcement of federal laws and regulations related to customs and immigration violations, including but not limited to narcotics, financial crimes, fraud, and violations of the Immigration and Nationality Act.

2. The information set forth in this affidavit is based upon my knowledge, training, experience, and participation in investigations involving the smuggling, possession, distribution, and storage of narcotics and narcotics proceeds. This information is also based on the knowledge, training, experience, and investigations conducted by fellow law enforcement officers, which have been reported to me either directly or indirectly. I believe this information to be true and reliable. This affidavit is intended to show merely that there is sufficient probable cause for the requested

warrant and does not set forth all of my knowledge about this matter. Your affiant did not withhold any information or evidence that would negate probable cause. I know it is a violation of 21 U.S.C. § 841(a)(1) for any person to knowingly or intentionally distribute, or possess with intent to distribute, a controlled substance.

## PURPOSE OF AFFIDAVIT

3. This Affidavit is made in support of an application for a warrant to search and seize evidence from the premises commonly known as the residential property located at **4848 Wolf Creek Pike, Dayton, OH 45417, including all outbuildings and curtilage** (hereafter referred to as the "**TARGET LOCATION**"). This premises is more fully described in Attachment A incorporated herein by reference. A list of the specific items to be seized from the **TARGET LOCATION** is attached hereto as Attachment B, and Attachment B is incorporated herein by reference.

4. Based upon the information below, I have probable cause to believe that inside the **TARGET LOCATION** there is property that constitutes evidence of the commission of a criminal offense; contraband, the fruits of crime, and things otherwise criminally possessed; and property designed or intended for use, or which is or has been used as a means of committing a criminal offense. Specifically, I have probable cause to believe that within the **TARGET LOCATION** there is evidence of violation of 21 U.S.C. § 841(a)(1), knowingly or intentionally distribute, or possess with intent to distribute, a controlled substance (hereinafter the "Target Offense").

5. Based on my training and experience, I am familiar with the methods used by persons involved in the illicit distribution of controlled substances and as a result, know the following:

2

a. It is common practice for drug traffickers to often maintain residences which are used as "stash houses" or locations for drug storage and distribution, and use "nominees" to obtain telephone service, utility service, and other services to hide the true identity of the owner or person who will use the service.

b. It is common practice for drug traffickers to hide their assets, their addresses, their telephone numbers, and cellular services by using other person's names in order to avoid detection by law enforcement officials.

c. It is common practice, that even though these assets are in nominee names, drug traffickers will continue to utilize these assets by exercising dominion and control over them.

d. It is common for drug traffickers to provide false information to law enforcement officials regarding their identity and the address of their actual residence.

e. It is common practice that drug traffickers possess large amounts of U.S. Currency in order to finance their ongoing illicit drug business.

f. It is common practice that drug traffickers maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other documents relating to the transportation and distribution of drugs. Drug traffickers commonly front (provide drugs on consignment) to their clients. The books, records, receipts, notes, ledgers, and other documents are kept where the drug traffickers have ready access to them.

g. That persons involved in drug trafficking conceal from law enforcement in their residences, vehicles, and businesses the following items: drugs, large amounts

of currency, financial instruments, jewelry, automobile titles, other items of value and/or proceeds of drug transactions, and evidence of financial transactions relating to the acquisition and concealment of large sums of money resulting from drug trafficking activities.

h. When drug traffickers amass large proceeds from the sale of drugs, they attempt to hide the true source of these profits, otherwise known as laundering the money. To accomplish this, drug traffickers many times utilize banks and/or financial institutions with their attendant services, including but not limited to, cashier's checks, money drafts, and letters of credit. Other entities used to launder drug proceeds include real estate firms and purported legitimate business fronts.

i. Drug traffickers commonly travel to facilitate their trafficking activities. After purchasing drugs, traffickers commonly transport, or cause to be transported, drugs to areas in which they will be distributed. Common methods of transportation include, but are not limited to, commercial airlines, and rental/private automobiles.

j. It is common practice that drug traffickers commonly maintain books and similar documents which reflect names, addresses, and/or telephone numbers of their associates in the drug trafficking organization. This information can often be stored in cellular phones in places such as the contacts list.

k. Drug traffickers often take, or cause to be taken, photographs of themselves, their associates, their property, and their product, and that the photographs are usually maintained at the residences and/or businesses of drug traffickers.

4

Photographs such as these can commonly be found and stored in cellular phones.

l. Drug traffickers commonly have in their possession, (that is on their person, at their residence, and/or their business) weapons, including firearms of various types. Firearms are used to protect and secure a drug trafficker's property which may include, but is not limited to, narcotics, jewelry, narcotics paraphernalia, books, records, and U.S. Currency.

m. Drug traffickers frequently maintain hidden compartments within their residence and vehicles to hide drug trafficking evidence (money, ledgers, drugs, etc.), bury evidence in containers such as shoe boxes, or hide the evidence in safes.

n. The exact quantities, prices, dates, and methods of delivery of drugs are seldom discussed in detailed terms over the telephone. These details are usually agreed upon during face-to-face transactions. For this reason, most telephone conversations regarding drugs are very brief and often in code, understood by the traffickers and designed to mislead or confuse non-participants of the conversations. Drug traffickers make extensive use of cellular phones and text messaging beepers/pagers to facilitate contacting one another. The structure of a drug distribution organization usually consists of sources of supply, wholesale distributors, retail distributors, and the ultimate consumers. The wholesale distributors often have more than one source of supply, and likewise the retail distributors often obtain drugs from more than one wholesale distributor. After receiving a quantity of drugs, the source of supply will often move the drugs to

a location other than where he/she sells them to the wholesale distributors. The location of the source of supply's so-called "stash house" is generally a well-guarded secret known only to the source of supply and his closest associates. Most of the drugs, as well as diluting and packaging materials and weighing equipment, are usually kept at the "stash house." Only those amounts needed for immediate sale are usually kept at the point of sale.

o. Drug traffickers frequently use rental vehicles for everyday travel and will maintain another vehicle, usually at an out of sight location, to facilitate their drug trafficking business.

p. Evidence of past communication between drug traffickers can be found in saved or deleted text messages, call logs, and other forms of electronic communication occurring over, stored in, or accessed by the cellular phone.

## PROBABLE CAUSE

6. In July 2024, the Delaware County Drug Task Force (DCDTF) and HSI Columbus developed information from two (2) confidential sources, CS-1 and CS-2, that Jon Christopher BIRT was involved in narcotics trafficking within the Southern District of Ohio. The sources advised investigators that they purchased methamphetamine from a subject only known as "Chris" (later identified as BIRT) from the Dayton, Ohio area who utilized phone number 937-560-9609. Subscriber information for this phone number from T-Mobile confirmed it belonged to BIRT. Investigators coordinated this investigation with the Regional Agencies Narcotics & Gun Enforcement (RANGE) task force in Montgomery County, Ohio.

7. On July 29, 2024, HSI Columbus and the DCDTF utilized CS-1.[1] to arrange the purchase of approximately one (1) pound of methamphetamine for $1,400 and one (1) ounce of cocaine for $650 from BIRT in Columbus, Ohio (Delaware County) within the Southern District of Ohio. At the direction of law enforcement, CS-1 contacted BIRT at his phone number (937-560-9609) and arranged the purchase. Prior to the meet, CS-1 was personally checked by investigators and confirmed to have no contraband and was then provided with prerecorded buy money. Law enforcement observed BIRT arrive at the predetermined meet location in a black 1998 GMC Sierra 1500 (Ohio registration JYQ5211) registered to him at 4848 Wolf Creek Pike in Dayton, Ohio (the **TARGET LOCATION**). The RANGE task force later confirmed that this vehicle was observed regularly in July 2024 parked at the **TARGET LOCATION**. CS-1 conducted the narcotics transaction with BIRT utilizing the prerecorded buy money. The RANGE task force observed BIRT's vehicle departing the Dayton, Ohio area prior to the controlled buy and returning to the Dayton, Ohio area after the controlled buy. The total weight of the narcotics purchased by CS-1 from BIRT was approximately 428 grams of methamphetamine and 27 grams of cocaine, which both field tested positive utilizing the TruNarc Handheld Narcotics Analyzer. CS-1 also positively identified a current driver's license photograph of BIRT from the Bureau of Motor Vehicles (BMV) as the subject he/she knew as "Chris," and who investigators observed conducting this narcotics transaction with CS-1.

8. On July 31, 2024, the RANGE task force obtained a vehicle tracker warrant for BIRT's black 1998 GMC Sierra 1500 (Ohio registration JYQ5211) through the state of Ohio based

---

[1] CS-1 is getting paid to provide information in reference to narcotics trafficking in the central Ohio area. CS-1 is believed to be reliable and credible based upon investigators being able to independently corroborate the information provided by CS-1 in reference to BIRT.

on the controlled purchase conducted on July 29, 2024, by the DCDTF and HSI Columbus. The tracker was deployed on BIRT's vehicle by the RANGE task force on August 1, 2024.

9. On August 7, 2024, the DCDTF and HSI Columbus utilized CS-2[2] to arrange the purchase of approximately one (1) pound of methamphetamine from BIRT in Columbus, Ohio (Delaware County) within the Southern District of Ohio. Prior to setting up this controlled purchase, the RANGE task force located BIRT's vehicle, a black 1998 GMC Sierra 1500 (Ohio registration JYQ5211), at the **TARGET LOCATION**, and established surveillance at that location. At the direction of law enforcement, CS-2 placed the call to BIRT's phone number (937-560-9609) to order the methamphetamine. Shortly after, the RANGE task force observed BIRT depart the **TARGET LOCATION** in his black GMC Sierra and begin travelling toward Columbus, Ohio. The RANGE task force conducted surveillance and followed the vehicle until it departed the Dayton, Ohio area and began travelling eastbound on I-70 toward Columbus. The vehicle tracker was then utilized by investigators to track BIRT to the meet location in Columbus, Ohio indicating that the vehicle never stopped along the way.

10. Consistent with the first controlled purchase, CS-2 was personally checked by investigators and confirmed to have no contraband and was then provided with prerecorded buy money. At the direction of law enforcement, CS-2 conducted the narcotics transaction with BIRT at the predetermined buy location utilizing the prerecorded buy money. Surveillance units then followed BIRT from the area and observed him begin to travel back westbound toward Dayton, Ohio. The tracker on BIRT's vehicle then indicated that BIRT returned to the Dayton, Ohio area after the controlled buy. The total weight of the narcotics purchased by CS-2 from BIRT was approximately 447 grams of methamphetamine, which field-tested positive utilizing the TruNarc

---

[2] CS-2 is working for case consideration and has previously provided information to other law enforcement agencies in the past that was deemed reliable and independently corroborated.

Handheld Narcotics Analyzer. CS-2 also positively identified a current driver's license photograph of BIRT from the Bureau of Motor Vehicles (BMV) as the subject he/she knew as "Chris" and who investigators observed conducting this narcotics transaction with CS-2.

11. On August 26, 2024, HSI Columbus obtained an arrest warrant via a criminal complaint for BIRT through the U.S. District Court in the Southern District of Ohio for violation of two (2) counts of Title 21 U.S.C. § 841(a)(1) and (b)(1)(C), knowingly and intentionally distributing a controlled substance, to wit: a mixture and substance containing a detectable amount of methamphetamine, its salts, isomers and salts of its isomers, a Schedule II controlled substance.

12. Further investigation of BIRT revealed he resided with possibly at least two (2) other people at the **TARGET LOCATION**, one being identified as Richard Dale BLANTON. BLANTON has an extensive criminal history for narcotics and weapons related charges through the State of Ohio, and he also has several active arrest warrants.

13. On August 27, 2024, the Dayton Police Department (DPD) encountered and arrested BLANTON at a gas station in Dayton, Ohio on his outstanding warrants and impounded his vehicle. A search of BLANTON and the vehicle resulted in the discovery of approximately 50 grams of methamphetamine, approximately one (1) gram of fentanyl, suboxone, some marijuana, and various drug paraphernalia.

14. On September 4, 2024, investigators coordinated another controlled purchase of methamphetamine from BIRT. At the direction of law enforcement, CS-2 made a call to BIRT and ordered one (1) pound of methamphetamine. The RANGE task force established surveillance on the **TARGET LOCATION** prior to the narcotics order being placed. BIRT was eventually observed by the RANGE task force loading a bag into the bed of his black 1998 GMC Sierra 1500 (Ohio registration JYQ5211), which was where BIRT had previously removed the narcotics from

9

during the previous two (2) controlled buys with the cooperating sources. BIRT then immediately departed the **TARGET LOCATION** in his black GMC Sierra 1500 and began travelling toward Columbus, Ohio followed by surveillance units and monitored through the use of the GPS vehicle tracker without making any stops.

15. On September 4, 2024, investigators had several marked Ohio State Highway Patrol (OSP) units standing by along I-70 eastbound in Madison County, Ohio to stop BIRT in the black 1998 GMC Sierra 1500 (Ohio registration JYQ5211) and arrest him on his outstanding felony warrant before he made it to Columbus, Ohio. Marked OSP units stopped him on I-70 eastbound at the State Route 56 exit in Madison County, Ohio and took BIRT into custody. A narcotics detection canine alerted to the presence of an odor of narcotics coming from the black GMC Sierra 1500. A probable cause and inventory search of the vehicle resulted in the discovery of approximately one (1) pound of methamphetamine concealed in a bag in the bed of the pickup truck where surveillance units previously observed him place the bag prior to leaving the **TARGET LOCATION**.

16. Record checks on BIRT indicated he was a convicted felon with an extensive criminal history in Ohio. BIRT served approximately 25 years in prison from 1990 to 2015 for rape and robbery convictions. In 2017, BIRT was arrested and charged in a federal narcotics investigation by the Federal Bureau of Investigation (FBI) and several state/local law enforcement partners in the Dayton, Ohio area. BIRT was sentenced to 66 months in prison for possession with intent to distribute over 50 grams of methamphetamine through the U.S. District Court in the Southern District of Ohio (Dayton). BIRT was released from federal custody in 2022 and was currently still on supervised release.

17. Record checks on the **TARGET LOCATION** through the Montgomery County (Ohio) Auditor's website indicated the **TARGET LOCATION** was owned by Marion and Mary Birt and linked to several other subjects with "Birt" as the last name. These subjects all appear to have some type of family relationship with BIRT.

18. Based on your affiant's training and experience, drug traffickers often maintain residences which are used as "stash houses" or locations for drug storage and distribution, and use "nominees" or fraudulent identifications to obtain residences, telephone service, utility service, and other services to hide the true identity of the owner or person who will use the residences or services.

19. Therefore, there is probable cause to believe that inside the **TARGET LOCATION** there is property that constitutes evidence of the commission of a criminal offense; contraband, the fruits of crime, and things otherwise criminally possessed; and property designed or intended for use, or which is or has been used as a means of committing a criminal offense. Specifically, I have probable cause to believe that within the **TARGET LOCATION** there is evidence of violation of Title 21, United States Code § 841(a)(1) and (b)(1)(C), knowingly and intentionally distribute a mixture and substance containing a detectable amount of methamphetamine, its salts, isomers and salts of its isomers, a Schedule II controlled substance. This information is based on the fact that investigators observed BIRT depart the **TARGET LOCATION** after a CS called him to place an order for some narcotics during the controlled buy on August 7, 2024, and then travelled from the **TARGET LOCATION** directly to meet with CS-2 in Columbus, Ohio without making any stops based partially on both visual and electronic surveillance. This information is also based on the fact that investigators observed BIRT place a bag in the bed of his pickup truck (which was later determined to contain methamphetamine) prior

to leaving the **TARGET LOCATION** after another order was placed for methamphetamine by a CS to be delivered to Columbus, Ohio on September 4, 2024. Therefore, the **TARGET LOCATION** is suspected of currently storing narcotics and/or narcotics proceeds.

## CONCLUSION

20. Based on the facts set forth in this Affidavit, there is probable cause to believe that beginning on an exact date unknown but at least July 2024 and continuing up to and including through the present, in the Southern District of Ohio, **Jon Christopher BIRT** did knowingly and intentionally distribute a mixture and substance containing a detectable amount of methamphetamine, its salts, isomers and salts of its isomers, a Schedule II controlled substance, in violation of Title 21, United States Code § 841(a)(1) and (b)(1)(C). Furthermore, there is probable cause to believe that within the **TARGET LOCATION** there is evidence of violations of the Target Offense, contraband, fruits of the Target Offense, and property designed for use, intended for use, and used in committing the Target Offense.

ROBERT KUKOVEC
Digitally signed by ROBERT KUKOVEC
Date: 2024.09.04 17:28:25 -04'00'

Robert Kukovec
Special Agent
Homeland Security Investigations

Subscribed and sworn to before me on this __4th__ day of __September__, 2024.

_____
ELIZABETH A. PRESTON DEAVERS
UNITED STATES MAGISTRATE JUDGE